IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TONYA M. KIRKLAND,                )
                                  )
        Plaintiff,                )
                                  )
v.                                ) CIVIL ACTION NO. 1:05cv109-MEF
                                  )[WO]
JO ANNE B. BARNHART,              )
Commissioner of Social Security,  )
                                  )
        Defendant.                )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff Tonya M. Kirkland ["Kirkland"] filed this action seeking review of a final

decision of the defendant ["Commissioner"] (Doc. # 1) pursuant to 42 U.S.C. §§ 405(g),

1383(c)(3) (2000).  Upon review of the record and the briefs submitted by the parties, the

Magistrate Judge recommends that the Commissioner's decision be affirmed.

## I.    FACTS AND PROCEDURAL HISTORY

Kirkland, who is 25 years old, applied for Supplemental Security Income ["SSI"]

disability benefits on 15 May 2003 alleging that she became disabled on 23 April 2000 (R.

48).[1]  According to documents she filed with the Social Security Administration ["SSA"],

---

[1]     Unlike with Social Security Disability Insurance Benefits, which may be paid to a
claimant who, though not disabled at the time the application is filed, "had a
disability that ended within the 12-month period before the month [he or she]
applied," 20 C.F.R. § 404.315, an SSI claimant must be disabled at the time the
application is filed or must become disabled while the application is being
considered administratively.  20 C.F.R. §§ 416.330, .335; *see also* **Romero v.
Barnhart**, 135 Fed. Appx. 172, 175-76 (10th Cir. 2005) ("[T]o be entitled to SSI

Kirkland's disability arose from her being "[m]entally very slow" and unable to "understand anything" (R. 73), though she took regular classes in school and completed the tenth grade (R. 240).[2]

She later testified that she also suffers from depression and indeterminate "stomach problems" ("either irritable bowel or . . . gastritis") (R. 237).  She has no past relevant employment (R. 21).[3]

After her application was denied initially, Kirkland requested a hearing before an administrative law judge ["ALJ"], who, following the hearing, issued an unfavorable decision (R. 13-22).  The SSA's Appeals Council subsequently denied Kirkland's request for review of the ALJ's decision, rendering the ALJ's opinion the final decision of the commissioner, and Kirkland filed this timely lawsuit (Doc. # 1).

---

benefits, plaintiff must show that she was disabled between . . . the date she filed her application . . . and . . . the date of the ALJ's decision."); *Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997) ("[O]ne can collect SSI . . . only as of the date of application, regardless of how long one may have suffered from a particular infirmity.").  Therefore, as Kirkland's attorney acknowledged at the administrative hearing (R. 234-35), Kirkland's alleged onset date is largely irrelevant, and whether she is eligible for benefits depends upon whether she was disabled on the date of her application or thereafter.

[2]     Her disability report states that she "completed" 11th grade (R. 76).  In addition, a psychologist interviewing her for a consultative examination noted that "Ms. Kirkland attended school through the eleventh grade.  She quit at age eighteen" (R. 106).  The ALJ accepted Kirkland's testimony on the matter, and the court adopts the ALJ's conclusion (R. 16).

[3]     Evidence in the record indicates Kirkland had been employed as a cashier, but the duration of her employment is not clear, and, again, the court simply adopts the ALJ's conclusion.

## II.   STANDARD OF REVIEW

The district court's review of the Commissioner's decision is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).  The court must affirm the Commissioner's decision "if it is supported by substantial evidence and the correct legal standards were applied," *Kelley v. Apfel*, 185 F.3d 1211 (11th Cir. 1999) (citing *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997)).[4]  This is true despite the existence of substantial evidence "contrary to the findings of the ALJ." *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  "There is no presumption, however, that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid." *Miles*, 84 F.3d at 1400 (citations omitted).

## III.   DISCUSSION

### A.   *Standard for Determining Disability*

An individual who files an application for Social Security disability benefits must

---

[4]       In *Graham v. Apfel*, 129 F. 3d at 1422, the Court of Appeals stated that:

> Substantial evidence is described as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

prove that she is disabled, which means that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (2000); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a) (2000).

The regulations governing disability determinations provide a five-step sequential evaluation process that the ALJ must follow to determine whether a claimant has proven that she is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also* **Ambers v. Heckler**, 736 F.2d 1467, 1469 (11th Cir. 1984); **Williams v. Barnhart**, 186 F. Supp. 2d 1192, 1195 (M.D. Ala. 2002).  If the claimant is not currently engaged in substantial gainful activity, the ALJ must determine whether she suffers from a severe impairment that has lasted or is expected to last 12 months or more.  §§ 404.1509, 416.909, 404.1520(a)(4)(i)-(ii), 416.920(a)(4)(i)-(ii).  If so, and the impairment(s) is of such severity as to meet or medically equal a condition described in the SSA's "Listing of Impairments," then the claimant will be found to be disabled.  §§ 404.1520(a)(4)(iii); 404, subpt. P, app. 1; 416.920(a)(4)(iii).

If the claimant's severe impairment(s) does not automatically qualify her for disability benefits, the ALJ must then assess her residual functional capacity ["RFC"], which represents "the most [a claimant] can still do despite [her] limitations."  §§ 404.1545(a), 416.945(a). Considering her RFC, the ALJ must determine whether the claimant is able to perform the physical and mental demands of her past relevant work.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If not, the ALJ must determine whether, considering her RFC, age,

4

education, and past work experience, the claimant is capable of performing other jobs available in significant numbers in the national economy. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c).

**B.    *Application of the Standard: The ALJ's Findings***

After discussing the legal standards and the evidence in the record, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.    The claimant's mild mental retardation/borderline intellectual functioning is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 416.920).

3.    This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.    The claimant has the residual functional capacity for unskilled work at all exertional levels.  The claimant's medical evidence of record, as summarized above does not reflect any ongoing treatment or objective findings of any impairment which would meet the 12 month durational requirement.

6.    The claimant has no past relevant work (20 CFR § 416.965).

7.    Considering the claimant's age, education, work history,

and residual functional capacity, there are significant numbers of jobs that exist in the national and local economies that claimant is capable of performing.

8.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 416.920(e)).

(Doc. # 21-22).

Thus, Kirkland's application failed because the ALJ concluded that she could perform jobs available in significant numbers in the national and local economies.

Kirkland disagrees and contends that the ALJ's opinion is not supported by substantial evidence. Specifically, she challenges the ALJ's conclusion that her borderline intellectual functioning is her only severe impairment and contends that her alleged depression and stomach problems are also "severe" as that term is defined in the regulations governing disability determinations (Doc. # 7, pp. 4-10).[5] In addition, she contends that he failed to

---

[5]    Kirkland's argument is premised on her apparent belief that she could satisfy the requirements for listing 12.05 if, along with her borderline intellectual functioning, she is found to have an additional severe impairment at step two of the evaluative process (Doc. # 7, pp. 1-3). 20 C.F.R. pt. 404, subpt. P, app. 1. The relevant subsection of listing 12.05 requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional *and significant* work-related limitation of function." *Id.* at 12.05(c).

Because substantial evidence in the record supports the ALJ's conclusion that Kirkland's borderline intellectual functioning was her sole severe impairment, the court does not address the issue of whether a threshold finding of an additional severe impairment is alone sufficient to satisfy the listing's requirements. The court notes, however, that a recent Court of Appeals decision, which does not address this issue explicitly, nevertheless lends support for an argument that Kirkland's conclusion, with which the ALJ apparently agreed (R. 265), is incorrect. ***Baxter v. Barnhart***, No. 05-11074, 2006 WL 250730, at *2 (11th Cir. Feb. 3, 2006) (affirming the Commissioner's finding that the claimant was not disabled and noting that "the

properly develop the record regarding her alleged stomach problems.  *Id.*

### C.      *Severe Impairments*

> At step two of § 404.1520 and § 416.920 a
> claimant's impairment is determined to be either
> severe or not severe.  Step two is a threshold
> inquiry.  It allows only claims based on the most
> trivial impairments to be rejected. The claimant's
> burden at step two is mild.  An impairment is not
> severe only if the abnormality is so slight and its
> effect so minimal that it would clearly not be
> expected to interfere with the individual's ability
> to work, irrespective of age, education or work
> experience.  Claimant need show only that her
> impairment is not so slight and its effect is not so
> minimal.

***McDaniel v. Bowen***, 800 F.2d 1026, 1031 (11th Cir. 1986).

Although a claimant's subjective statements must be evaluated to determine whether

objective evidence supports the allegations themselves or establishes the existence of a

condition "of such a severity that it can be reasonably expected to give rise to the alleged"

symptoms, ***Holt v. Sullivan***, 921 F.2d 1221, 1223 (11th Cir. 1991), the impairment

nevertheless "must be established by medical evidence consisting of signs, symptoms, and

laboratory findings."  20 C.F.R. § 416.908.  Moreover, and importantly for this case, the

impairment "must have lasted or must be expected to last for a continuous period of at least

---

ALJ properly concluded that Baxter did not have an impaired MRFC beyond his
borderline intellectual functioning and depression"); *see also* ***Walters v. Barnhart***,
184 F. Supp. 2d 1178, 1184 (M.D. Ala. 2001) ("The ALJ's finding that the plaintiff
suffered from severe impairments is not tantamount to a conclusion that these
impairments imposed significant work-related limitations.").

12 months." 20 C.F.R. § 416.909; *see* ***Wilkinson ex rel***. ***Wilkinson v. Bowen***, 847 F.2d 660, 662-63 (11th Cir. 1987).

As noted above, in her original disability report, which she completed in May 2003 shortly after her initial application, Kirkland assigned the cause of her disability to her intellectual functioning (R. 73).  Her daily activities questionnaire, completed a few days later, indicated that "sometimes all [she wants] to do is sleep" (R. 82).  She noted that she is able to care for her personal needs, such as "bathing, grooming, dressing," without assistance (R. 82).  She can prepare meals as well as shop and mop, sweep and do laundry all without assistance (R. 83).

In her spare time, she wants only to sleep.  Although she admitted watching television, she was unresponsive to an inquiry regarding the extent of her television watching (R. 83).  She also stated that she cannot not "pay attention to the radio or TV programs," but she can remember what she listened to or watched (R. 83).

Although she noted that she does not go out "a lot," she also stated that she drives herself to the grocery store or doctor (R. 84).  Her social life is limited because she "doesn't trust many people" and doesn't "like crowds," but she is able to care for her children (R. 84).[6]

_____

[6]    There is some inconsistency regarding this.  At her hearing, Kirkland testified that she generally is not able to care for her children, and her mother and sister-in-law are primarily responsible for their care (R. 250).

Her testimony led to another incongruity.  She stated that her sister-in-law rose at night to care for her infant child (R. 250).  Her mother-in-law testified, however, that it was she who took the baby at night (R. 258).

Their testimony further conflicted regarding Kendrick's sleep habits.  Kendrick

8

She seemed confused about some of the questions on the form, and she stated that she was forgetful to the point that she left "grease on stove and kitchen [sic] caught fire" (R. 85). At the time, she claimed to be taking "Effor" for her condition (R. 85).[7]

Kirkland's former husband's mother, with whom Kirkland lived at the time, also completed a report (R. 87-90). She described Kirkland's activities as "mainly sleeping," and her responses did not materially differ from Kirkland's.

In a work history report prepared on 9 June 2003 for her initial application, Kirkland's description of her condition changed somewhat. She mentioned neither her intelligence nor her alleged depression. Instead, she focused on her back and neck. "I couldn't work because of back and neck problems. I was born with problems to my neck. My back is involed [sic] because my neck turns the wrong way in my spine" (R. 68).

After her initial application was denied, Kirkland requested a hearing and again

---

stated that she goes to bed around 9 or 10 p.m., while her mother-in-law testified that she is asleep by 6 p.m. (R. 258).

Finally, the court notes that, while the insight a typed transcript affords is limited, much of Kirkland's and her mother-in-law's testimony appears rather equivocal and very little convincingly certain.

[7]   She likely meant Effexor, which the record indicates she was prescribed once to treat anxiety in 2001 (169-70). She also testified that her mother-in-law provided her with Effexor, which Kirkland said she took every day (R. 246). Less than a month before her hearing, however, she informed Kenneth Roberts, M.D., who treated her during a hospitalization for alleged stomach problems, that she was not taking any medications (R. 137-38). Prior to this occasion, she told the psychologist performing a consultative examination that she was not on any "antidepressant medication" (R. 106). Moreover, her mother-in-law testified that she gave Kirkland Effexor only when she had "extra" (R. 260).

focused her complaints on her neck and back, though she did mention depression and, for the first time, "severe headaches" (R. 36).

### 1.    Depression

On 30 June 2003, J. Walter Jacobs, Ph.D., provided a consultative psychological examination (R. 106-09A). In his notes, Dr. Jacobs stated that Kirkland told him that "she was prescribed Effexor for a *period of time*" and "*implied*" that it was prescribed "because of depression associated with medical problems" (R. 106).[8] She also told him of past problems "with her gallbladder and kidney stones" and complained of "problems with [her] neck and back" (R. 106).

Dr. Jacobs also indicated that he had received information from the SSA "suggest[ing] that [she] may experience depression due to the death of her mother" (R. 106). Kirkland, however, "did not mention this in the course of the interview." *Id.*

She "described sleep as either excessive or poor" and indicated that "[c]urrently, her sleep is excessive" (R. 107). "Her appetite was described as fair. Her energy is poor. Asked about feelings of sadness, she responded, 'all the time'. Asked about crying episodes, she

---

[8]    Kirkland's brief seizes upon the 2001 prescription for Effexor. What she once implied to Dr. Jacobs, however, she now adopts as truth and as evidence of the seriousness of her depression, noting that "it should be clear that the Effexor was prescribed to get the depression under control" (Doc. # 7, p. 2). It is not clear, however. In fact, the record indicates that Kirkland's one-time Effexor XR prescription was aimed at treating "anxiety with *probable* depressive features complicating" a hospital visit for pain associated with recent surgery to remove her gall bladder (R. 169-70) (emphasis added).

responded, 'a lot'.  She denied having any thoughts of suicide." *Id.*[9]

Regarding her daily activities, she stated that she "spends her day caring for her two young children.  She is able to provide for their needs and her own needs.[10]  She does operate an automobile.  Ms. Kirkland denied having any hobbies or special interests" (R. 109).

Dr. Jacobs administered a variety of intelligence tests, which demonstrated that Kirkland had a "verbal IQ of 71," a "performance IQ of 65," and a "full scale IQ of 66" (R. 108).  This "place[d Kirkland] on the upper reaches of the mild range of mental retardation." *Id.*

Although Dr. Jacobs described Kirkland as "completely cooperative" and apparently "adequately motivated," he also noted that Kirkland apparently "was not truthful in providing her history to the examiner" (R. 106).  He concluded

> Ms. Kirkland is a person of limited intellectual ability and *should be employable in a range of unskilled or semiskilled jobs*. She appears to be *mildly to moderately* depressed secondary to divorce and the accidental death of her mother.  She is also burdened with the care of two young children.  In regard to her depression, Ms. Kirkland would certainly benefit from individual counseling and antidepressant medication which she might obtained [sic] through the mental health center.
>
> * * *
>
> In the examiner's opinion, Ms. Kirkland is capable of

---

[9] Her statement to the psychologist does not comport with her testimony before the ALJ.  When queried by her attorney whether she ever "feel[s] suicidal," Kirkland responded, "Sometimes" (R. 251).  She then stated that she had in the past attempted to hurt herself.  *Id.*  Dr. Jacobs's notes did not mention this behavior. *Id.*

[10] *See supra* note 6.

11

functioning independently and managing financial resources.

(R. 109) (emphasis added).[11]

Dr. Jacobs did not opine regarding whether Kirkland's depression would more than minimally affect her ability to perform work-related functions, though his conclusion regarding her employability certainly suggests that it would not. He ultimately diagnosed Kirkland with "Major Depression, *Single Episode*, *Moderate*" and "Borderline Intellectual Functioning" (R. 109) (emphasis added).

After reviewing Kirkland's medical records as well as Dr. Jacobs's report, Kenneth Warren, Ph.D., determined that Kirkland's allegations were "partially credible" but concluded that "she should be able to perform work" (R. 127). On a Psychiatric Technique Review Form, he indicated that Kirkland would not be restricted in her "activities of daily living" and did not experience "repeated episodes of decompensation, each of extended duration" (R. 124). In addition, Kirkland would incur only mild difficulty "in maintaining social functioning," and, consistent with her borderline intellectual functioning, she would incur moderate difficulty in "maintaining concentration, persistence, or pace" (R. 124).

Dr. Warren also completed a mental RFC assessment form, in which he noted, at worst, several moderate limitations, which, in general, do not appear logically related to her alleged depression as opposed to her alleged borderline intellectual functioning.[12] Notably,

---

[11]   The "Initial Claimant Contact Form" indicates that Kirkland's mother was killed in an accident in mid-2001 (R. 91).

[12]   In fact, most more logically could be correlated to her cognitive abilities. He noted moderate limitations in the following areas:

despite alleged sleeping disturbances, which Kirkland correlated to her depression, Dr. Warren found that she would not be significantly limited in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance" (R. 130).[13]

Drs. Jacobs and Warren offer the only medical insight in the record into Kirkland's alleged depression, and they do not establish the existence of a severe impairment. It is

_____

1. "ability to understand and remember detailed instructions";
2. "ability to carry out detailed instructions";
3. "ability to maintain attention and concentration for extended periods";
4. "ability to sustain an ordinary routine without special supervision";
5. "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods";
6. "ability to accept instructions and respond appropriately to criticism from supervisors";
7. "ability to respond appropriately to changes in the work setting";
8. "ability to set realistic goals or make plans independently of others".

[13]   In addition, Dr. Warren concluded that Kirkland would not be significantly limited in any of the following areas, several of which logically correlate to her alleged depression:

1. "ability to remember locations and work-like procedures";
2. "ability to understand and remember very short and simple instructions";
3. "ability to carry out very short and simple instructions";
4. "ability to work in coordination with or proximity to others without being distracted by them";
5. "ability to make simple work-related decisions";
6. "ability to interact appropriately with the general public";
7. "ability to ask simple questions or request assistance";
8. "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes";
9. "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness";
10. "ability to be aware of normal hazards and take appropriate precautions"; and
11. "ability to travel in unfamiliar places or use public transportation".

reasonable to conclude, based on those reports, that her depression would not interfere with her ability to work, even minimally.

Beyond the substance of the reports themselves, which, to be clear, do not compel a conclusion contrary to the ALJ's, Kirkland's claim is compromised in a far more fundamental way.  Throughout this opinion, the court has noted inconsistencies in the information and testimony Kirkland has provided throughout the application and review process.  These inconsistencies pervade the administrative record, and, while none, viewed individually, shocks the conscience, cumulatively, their impact on the court's quest for the truth multiplies exponentially.

Rarely, if ever, is a testifying party's veracity more important than in a case such as this, when a claim is premised largely on a psychological condition evidenced only by conclusions offered by doctors essentially evaluating the claimant's responses to questions, which generally control the diagnosis.  Psychotherapists, perhaps more than other medical professionals, must rely on their patients to be truthful and forthright when responding to their inquiries, and when the patient's integrity is questionable, the legitimacy of the therapists' conclusions must also be questioned.

The evidence in this case illuminates Kirkland's proclivity for exaggeration when it may serve her cause.  A person claiming to be mentally challenged (i.e., mildly retarded and depressed) with the hope of obtaining government benefits may, if questioned, respond that two plus two equals three.  Either she believes this to be true, in which case her claims may be legitimate, or she does not, in which case she is designing a response that she believes

14

most suits her needs.

Considering the abundance of troubling statements reflected in the record,[14] Kirkland

---

[14]    A few examples not heretofore mentioned are worth noting:

- She testified that she could not do "simple reading, simple writing, simple math" (R. 240), yet she was able to obtain her driver's license as well as a position at Wal-Mart as a cashier (R. 240). Although she lost her job with Wal-Mart, she blamed her inability to stand for long periods of time and to fully understand how to use the register and not, as one might reasonably conclude, her inability to count change (R. 241). Moreover, as noted above, on her work history report, Kirkland attributed her inability to work to her back and neck pain and nothing else (R. 68).

- Kirkland testified that she had worked at Wal-Mart for a month and for a telemarketing company for approximately two days in the late 1990s (R. 240-41). She also denied having ever worked as a restaurant cashier (R. 254). Yet, a disability report completed telephonically indicates that she worked as a cashier at "different stores" for a *seven month* period in 2000 (R. 74). Furthermore, a handwritten work report that she apparently filled out herself states that she had, in fact, worked as a restaurant cashier (R. 61).

- Her original disability application states, "I do not get help or money from any person not living with me . . . to pay for food, rent," etc. (R. 49). At the time, she lived with her two children and her ex-husband's mother, Sandra McKenzie, but did not list her ex-husband as living with them (R. 53). At her hearing, however, she admitted that her ex-husband, who does not in fact live with them, pays her bills (R. 242).

- Kirkland testified, "Everything I eat sours on my stomach, it don't matter what it is. I can ever [sic] eat a cracker. So tend [sic] not to eat because I don't want to be sick. And the only way that I can get rid of it is only if I throw up and then I constantly throw it up until I get it completely out of my system" (R. 243). Nevertheless, she stated that the last time she was treated for abdominal pain, the doctor told her she could resume a normal diet, yet she failed to mention his recommendation, as noted in the record, of "fiber supplementation" (R. 144). Moreover, on a previous hospital visit for abdominal pain, records indicate that Kirkland ignored a restricted diet and "nurses witnessed her eating five chalupas and [an] old bag of wedding cookies indicating significant noncompliance with our interventions despite her bitter complaints" (R. 169).

appears to fall within the latter category, and her excuse that she does not have a good memory (R. 255) is not a sufficient explanation particularly when her poor memory more logically explains her inability to remember her previous statements, which increases the likelihood that a fabrication may be exposed, as opposed to her inability to recall events and facts in a truthful way.

By according significant weight to the reports issued by Drs. Jacobs and Warren and by assigning even partial credit to Kirkland's allegations, the ALJ generously afforded Kirkland the benefit of the doubt. This court is less inclined to do so and thus easily concludes that the ALJ's findings that Kirkland's alleged depression was not a severe impairment as well as his finding that the objective evidence does not support her subjective complaints are strongly supported by the substantial evidence in the record.[15]

### 2.    Stomach Problems

Although the documents Kirkland submitted in support of her original claim failed to mention her alleged stomach problems, she now contends, as she did at her administrative hearing, that she suffers from a yet unidentified gastric disorder.

---

[15]    The ALJ correctly factored into his decision Kirkland's failure to seek treatment for her alleged depression (R. 20). Although Kirkland contends that she cannot afford therapy, at the hearing, she acknowledged awareness of low-cost, income-based therapy and admitted that she had made only one previous attempt to pursue that course (R. 255-56). Furthermore, her testimony that her mother-in-law may in the future try to get her into the low-income treatment undermines her claim regarding her ability to afford it. *Id.* Finally, the equivocality of her testimony, which the court has already concluded is not worthy of belief, provides little assurance that Kirkland is concerned enough about her condition to pursue any treatment seriously.

During the relevant time period, Kirkland twice sought treatment for abdominal pain, once on 29 March 2004 and again on 4 May 2004. The records from the first visit do not indicate a formal diagnosis, though it appears her pain was correlated to a cesarean-section surgical operation Kirkland underwent approximately six weeks prior to her visit (R. 146).

On her second visit to the emergency room for abdominal pain, her treating physicians could not determine with certainty any particular cause despite administering an esophagogastroduodenoscopy as well as a colonoscopy, neither of which revealed a physiological problem (R. 141-44). Jeffrey J. Crittenden, M.D., ultimately concluded that her "symptoms are most consistent with IBS (irritable bowel syndrome) type presentation, especially *in the absence of any other objective abnormalities*. This can be managed in the *routine fashion* with reassurance, fiber supplementation and antispasmodics" (R. 144) (emphasis added).

Thus, the ALJ concluded that "[t]he medical evidence of record indicates claimant has been treated on an emergency room basis for acute episodes which do not meet the durational requirements of the Act" (R. 20). *See* 20 C.F.R. § 416.909. Clearly, his conclusion is supported by the record.[16]

---

[16]   Kirkland's contention that the ALJ should have ordered an additional consultative examination from a gastroenterologist lacks merit. Approximately one month prior to her hearing, Kirkland's doctors administered thorough, invasive examinations only to conclude that her condition most likely was irritable bowel syndrome, which could be conservatively treated. This evidence was sufficient to make a disability determination, and the ALJ was not obligated to order an additional consultative examination. 20 C.F.R. § 416.919a.

Kirkland's reliance on records indicating previous complaints of abdominal pain is

## IV. CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that the Commissioner's decision be AFFIRMED.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **24 February, 2006.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982).  *See **Stein v. Reynolds Securities, Inc.***, 667 F.2d 33 (11th Cir. 1982).  *See also **Bonner v. City of Prichard***, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the

---

also misplaced.  The record reflects that, prior to her hospital visits in March and May 2004, Kirkland was last treated for abdominal pain in December 2001, which is well outside the relevant time period.  Moreover, the record lacks evidence that Kirkland had any additional abdominal problems for the following 27 months, which strongly suggests that her pain in 2001 was unrelated to her pain in 2004.

decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 10th day of February, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED   STATES   MAGISTRATE   JUDGE